UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

CLALIT HEALTH SERVICES,                    :

                 Plaintiff,        :

      - against -                 :        **OPINION**

ISRAEL HUMANITARIAN FOUNDATION,    :        02 Civ. 6552 (DC)

             Defendant.        :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**   EISEMAN, LEVIN, LEHRHAUPT & KAKOGIANNIS, P.C.
            Attorneys for Plaintiff
               By:  Stephen L. Weinstein, Esq.
                   Eric R. Levine, Esq.
            845 Third Avenue
            New York, New York  10022

            ALVY & JACOBSON
            Attorneys for Defendant
               By:  Monica R. Jacobson, Esq.
            225 Broadway, Suite 1901
            New York, New York  10007

**CHIN, D.J.**

      In this diversity action for breach of contract and declaratory relief, two not-for-profit entities dispute entitlement to certain bequests of two estates.  Before the Court are cross-motions for partial summary judgment.  For the reasons that follow, both motions are granted in part and denied in part.

**STATEMENT OF THE CASE**

**A.   The Facts**

      The facts have been described in detail in two prior memorandum decisions, <u>Clalit Health Services v. Israel Humanitarian Foundation</u>, No. 02 Civ. 6552 (DC), 2003 WL 22251329, at **1-2 (S.D.N.Y. Sept. 30, 2003) ("<u>Clalit I</u>"), and <u>Clalit</u>

Health Services v. Israel Humanitarian Foundation, No. 02 Civ. 6552 (DC), 2004 WL 2199505, at \*\*1-4 (S.D.N.Y. Sept. 29, 2004) ("Clalit II").  Familiarity with Clalit I and Clalit II is assumed.  A brief background and additional facts pertinent to this motion are detailed below.

     **1.**   **The Parties**

     Plaintiff Clalit Health Services ("Clalit") is a not-for-profit corporation existing under the laws of Israel, with its principal place of business in Israel.  (Aviram Decl. ¶¶ 2-3).  Clalit provides medical and health care services in Israel. (Id. ¶ 2).  Defendant Israel Humanitarian Foundation ("IHF"), formerly known as Israel Histadrut Foundation, is a not-for-profit corporation organized under New York law, with its principal place of business in New York.  (Def.'s 56.1 Statement Ex. 1).[1]  IHF is a charitable foundation that solicits and administers charitable donations for diverse humanitarian causes. (Id.).

     From its inception until 1996, IHF raised money to provide assistance to Histadrut, a social organization started in Israel in 1920 that provided social services, including medical services, to its members.  (Id. ¶¶ 1, 4; Am. Compl. ¶ 10).[2]  The medical arm of Histadrut was Clalit, so money raised by IHF for

---

     [1]    Where one party's 56.1 Statement is cited, the other side has not disputed the fact in question, unless otherwise indicated.

     [2]    Both parties cite the amended complaint for the background information about the Histadrut.

medical services in Israel was, until that time, invariably given by IHF to Histadrut and, in turn, by Histadrut to Clalit. (Abrams Decl. ¶¶ 3-5, 7). There was no contractual relationship between Clalit and IHF. (Id. ¶ 6).

In January 1995, a new health insurance law became effective in Israel that guaranteed medical care to all residents by using payroll deductions to fund four designated service providers, the largest of which is Clalit. (Aviram Decl. ¶ 3). As a result of the new law, Clalit no longer receives funding from the Histadrut. (Def.'s 56.1 Statement ¶ 8). In addition, residents of Israel no longer need to be members of Histadrut to be members of Clalit, as was previously the case. (Aviram Decl. ¶ 3).

This changed the relationship IHF had with Histadrut, and in turn its relationship with Clalit. (Id. ¶ 6; Abrams Decl. ¶¶ 12, 13, 14, 15). Whereas before IHF had raised money exclusively for Histadrut (that, when earmarked for medical services, would be given by Histadrut to Clalit), IHF began to bypass Histadrut[3] and enter into agreements with individual charitable entities in Israel, including Clalit. (Def.'s 56.1 Statement ¶¶ 13, 14). On September 9, 1996, IHF and Clalit entered into a "memorandum of understanding" (the "MOU") that governed the terms of IHF's ongoing fundraising efforts for Clalit. (Id. ¶ 14). Most importantly for purposes of this

---

[3]    It was around this time that IHF changed its name from "Israel Histadrut Foundation" to its current name of "Israel Humanitarian Foundation." (Def.'s 56.1 Statement ¶ 6).

lawsuit, the MOU required IHF to "transmit . . . to [Clalit] . . . the contributions and bequests which IHF receives on its behalf."  (MOU ¶ 5).

The MOU also required IHF to disclose to Clalit the following:  (1) regarding "prior" bequests, "[a] list of bequests to [Clalit] and/or its facilities currently on file with the IHF . . . including the recipient institution, department, etc., and the outright amount and/or percentage of bequest" (id. ¶ 7(d)); (2) "copies of all documents relating to bequests, executed wills, charitable remainder trusts, perpetual trusts and/or annuities of every type, as well as all chattel and/or real properties of every type, naming [Clalit] and/or any of its facilities as donee and/or beneficiary" (id. ¶ 8); (3) "in the case of segregated endowment funds, all relevant information regarding the time period of the trust, the income per annum and the principal amount at the conclusion of the period" (id. ¶ 9); and (4) "if requested, an accounting and all relevant information regarding estates in probation in which [Clalit] is named as beneficiary in whole or in part, including total and final distribution figures of said estates."  (Id. ¶ 10).

## 2.   **The Berlin Will**

On or about July 27, 1984, Leon Berlin executed a will (the "Berlin Will") in California.  (Berlin Will at 1).  Berlin died on June 21, 1999.  (Def.'s 56.1 Statement ¶ 46).  The Berlin Will makes eight specific bequests, in amounts ranging from $5,000 to $20,000, and then provides:

I give the residue of my estate, after payment of taxes as directed in the clause entitled Death Taxes, to the charitable beneficiary named below, provided that on the date of my death it is an organization described in section 2055(a) of the Internal Revenue Code.  If it is not an organization so described, I give the residue as follows:

Charitable beneficiary:  ISRAEL HISTADRUT FOUNDATION, INC., whose present address is 8455 Beverly Boulevard, Los Angeles, California.

Alternative distribution:  To Jewish Charities for the education of underprivileged, needy and deserving children in Israel, which charities are to be selected by my Executor.

I request that said gift, be used, if possible, by the ISRAEL HISTADRUT FOUNDATION, INC., as follows:

(1)  Twenty-Five percent (25%) of said gift to be directed for use at the Histadrut Carmit Children's Village in Jerusalem, Israel, and Children's Village of Histadrut at Tivon, Haifa, Israel;

(2)  Twenty-five percent (25%) of said gift to be used to establish scholarships in the names of my late parents HYMAN BERLIN and REBECCA BERLIN, for needy and deserving children through the Histadrut Scholarship Fund;

(3)  Twenty-five percent (25%) of said gift to be directed for use by the KUBAT [sic] HOLIM for general pediatric purposes;

(4)  Twelve and one-half percent (12½%) of said gift is to be directed to the HISTADRUT AMAL EDUCATIONAL SYSTEM; and

(5)  Twelve and one-half percent (12½%) of said gift is to be directed for use at KAPLAN HOSPITAL in Rehovot, Israel, and used, if possible, for cancer research in the department of Dr. Zvi Bentwich.

Each use of this residuary gift is to be

> commemorated by a plaque or other
> testamentary acknowledgment in the names of
> my late parents HYMAN BERLIN and REBECCA
> BERLIN.[4]

(Berlin Will at 3-4). IHF received a total of $2,869,090.93 from the Berlin estate. (Pl.'s 56.1 Statement ¶ 24). IHF did not transfer any of the funds it received from the Berlin estate to Clalit. (Id. ¶ 27). Instead, IHF transferred $500,000 from funds received from the Berlin estate to the "IHF Geriatric Center" in or about January 2001. (Id. ¶ 26).

### 3. The Nower Trust

Joseph Nower executed a revocable living trust on March 16, 1992 (the "Nower Trust"). (Id. ¶ 29). Elaine Levitt, the former national sales director of IHF, is listed as one of the trustees of the Nower Trust. (Id. at ¶ 17; Nower Trust at 1, 7). The trust document does not indicate that Levitt was appointed in her capacity as an IHF employee. Nower directed that upon his death

> all property then belonging to the income or
> principal of the Trust shall be distributed
> as follows:
>
> . . .
>
> (2) The Entire Trust Corpus and
> all accumulated income shall be
> distributed and paid over as soon as
> reasonably possible as law and good
> administration will permit to the Israel
> Histadrut Foundation . . . for the
> express benefit and general use in

---

[4] Clalit was formerly known as "Kupat Holim" or "Kupat Holim Clalit." (Def.'s 56.1 Statement at ¶ 3; Am. Compl. ¶ 9). It is also apparently not in dispute that Kaplan Hospital was a Clalit facility.

> Israel of the Kupat Holim Hospitals in
> Israel and for no other purpose and said
> charitable foundations should not use
> the funds domestically.

(Nower Trust at 6).  As to how the trust would be funded, the trust document provided that Nower "or another person or persons[] may hereafter deposit with the Trustees cash or other property, or may add to the trust by inter vivos gift, testamentary bequest or otherwise."[5]  (<u>Id.</u> at 1).  The trust was never funded.  (Pl.'s 56.1 Statement ¶ 33; Def.'s 56.1 Statement ¶ 60).

Nower died on February 18, 1999.  (Def.'s 56.1 Statement ¶ 57).  A court-appointed guardian prepared a final accounting of Nower's assets and found that none of Nower's assets had been placed in the Nower Trust.  (<u>Id.</u> ¶ 59).  In addition to furniture, personal possessions, a condominium, and a State of Israel bond, Nower's assets consisted primarily of certificates of deposit that were held in "In Trust For" ("ITF") accounts for IHF.  (<u>Id.</u>).  The guardian, after securing an order from a Florida probate court, distributed the ITF account proceeds to IHF in the spring of 1999.  (<u>Id.</u> ¶ 61 & Ex. 32).  IHF received somewhere between $588,000 and $606,972.22 from the ITF accounts.  (<u>Id.</u> ¶ 62; Pl.'s 56.1 Statement ¶ 37).  IHF did not transfer any of the proceeds it received from the ITF accounts to Clalit.  (Pl.'s 56.1 Statement ¶ 38).

---

[5]    The Nower Trust provided that by execution of the trust document, Nower was transferring to the Trustees "the property set forth in Schedule 'A' hereto annexed."  (Nower Trust at 2).  No Schedule A was annexed.  (Def.'s 56.1 Statement ¶ 54).

**B.  Procedural History**

Clalit filed this action on August 16, 2002.  On November 14, 2002, IHF moved to dismiss the original complaint in part for lack of subject matter jurisdiction under the Declaratory Judgment Act and for failure to state a claim.  On September 29, 2003, that motion was granted in part and the complaint was dismissed in part.  On January 9, 2004, Clalit filed an amended complaint.  On March 11, 2004, IHF moved to dismiss portions of the amended complaint for failure to state a claim.  On September 28, 2004, that motion was granted in part and the amended complaint was dismissed in part.

The remaining claims include allegations that IHF breached the MOU when it (1) directed funds derived from the Berlin and Nower estates to non-Clalit entities, and (2) failed to produce documents and transfer funds from other bequests that name Clalit.  (Am. Compl. ¶¶ 59, 60).  Also remaining are claims for a declaratory judgment that the MOU obligates IHF to (1) transfer to Clalit "all monies that were donated or bequeathed to IHF that named Clalit or a Clalit program or facility as the intended recipient of the Bequest, for Clalit's benefit, whether bequeathed prior to or after September 9, 1996"; (2) account to Clalit regarding all estates in probate and all bequests intended for Clalit; and (3) provide information pursuant to paragraphs 7-10 of the MOU.  (Am. Compl. ¶ 64).

Following discovery, on March 3, 2005, and April 4, 2005, respectively, IHF and Clalit filed cross-motions for

partial summary judgment. IHF moves for summary judgment dismissing the claims alleging breach of contract with respect to the Berlin and Nower Estates and one of the claims seeking declaratory relief.[6] Clalit moves for summary judgment as to its breach of contract claims with respect to the Berlin and Nower Estates. For the reasons that follow, both parties' motions are granted in part and denied in part.

**DISCUSSION**

**A.** **Summary Judgment Standard**

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord

---

[6]     IHF moves for summary judgment only on the first of the three remaining claims for declaratory relief detailed above. (Def.'s Affirmation in Support of Def.'s Motion for Summary Judgment ¶ 3 ("Defendant's motion seeks summary judgement [sic] with respect to . . . Plaintiff's request for declaratory relief, as set forth in paragraph 64(b) of the Plaintiff's Amended Complaint.")).

<u>Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus.</u>, 475 U.S. at 586. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. <u>Anderson</u>, 477 U.S. at 249-50. As the Court held in <u>Anderson</u>, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> (citations omitted).

**B.** **<u>Breach of Contract</u>**

    **1.** **<u>Elements of a Breach of Contract Claim</u>**

For a contract to be valid under New York law,[7] there must be an offer, acceptance, and consideration. <u>Oscar Prods., Inc. v. Zacharius</u>, 893 F. Supp. 250, 255 (S.D.N.Y. 1995)(citation omitted). To prevail on a claim for breach of contract under New York law, a plaintiff must prove "(1) the existence of an agreement between the plaintiff and defendant; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach." <u>Tagare v. NYNEX Network Sys. Co.</u>, 921 F. Supp. 1146, 1149-50 (S.D.N.Y. 1996).

---

[7] New York law applies to the interpretation of the MOU for the reasons set forth in footnote 5 of <u>Clalit I</u>. <u>Clalit I</u>, 2003 WL 22251329, at *3 n.5.

The parties here do not dispute that the MOU is an enforceable contract.  Rather, they dispute whether IHF breached the MOU when it declined to turn over to Clalit a portion of the funds it received from the Berlin and Nower bequests.  Resolution of this dispute depends on whether the funds were left to IHF "on Clalit's behalf," an issue that requires the Court to interpret the written instruments in question.

### 2.  **The Berlin Will**

The residuary Berlin estate was left to IHF, with a portion to be "used, if possible, by [IHF], as follows":  25% to "Kubat [sic] Holim for general pediatric purposes," and 12.5% "for use at Kaplan Hospital in Rehovot, Israel, and used, if possible, for cancer research in the department of Dr. Zvi Bentwich."  (Berlin Will at 3-4).  The MOU obligates IHF to transmit to Clalit all funds that IHF received "on [Clalit's] behalf."  (MOU ¶ 5).  Thus, to determine whether IHF breached the MOU when it declined to transmit the Berlin funds to Clalit, it is necessary first to ascertain whether IHF received the funds on Clalit's behalf.  IHF argues here, as it did in Clalit II, that the proceeds it received from the Berlin Will were not received on Clalit's behalf because the language Berlin used -- "I request that said gift, be used, if possible" -- was merely precatory, and therefore IHF was entitled to use its discretion as to the use of the funds.  See Def.'s Mem. of Law at 15-20.  I disagree.[8]

---

[8]   I note here that the parties expend considerable energy arguing over whether the law of the case doctrine applies here, after I wrote in Clalit II that:

IHF is correct that in some cases an expression of a
request or a desire by a testator will result in a merely
precatory trust that is not binding on the beneficiary.  For
example, in <u>In re Estate of Moore</u>,[9] the court wrote that "[w]ords
of request, recommendation and the like will be interpreted as
mandatory when they are addressed to an executor, but only as a
request -- i.e., in their actual precatory sense -- if addressed
to a devisee."  61 Cal. Rptr. 722, 725 (Cal. Ct. App. 1967).  It
is equally true, however, that the use of precatory language will

---

            IHF argues that the language in the Berlin
            Will is precatory and gives IHF ultimate
            authority as to the disposition of the
            bequest.  I disagree.

<u>Clalit II</u>, 2004 WL 2199505, at *10.  Clalit argues that this
should operate as law of the case, and thus I should not revisit
the issue of whether the Berlin Will is precatory.  This ignores
the distinction between a pre-discovery motion to dismiss and a
post-discovery motion for summary judgment.  <u>See, e.g.</u>, <u>Golden
Pac. Bancorp v. FDIC</u>, No. 95 Civ. 9281 (NRB), 2003 WL 21496842,
at *5 n.14 (S.D.N.Y. June 27, 2003) (noting distinction, for
purposes of law of the case doctrine, between decision on motion
to dismiss and decision on summary judgment); <u>McKenzie v.
Bellsouth Telecomms., Inc.</u>, 219 F.3d 508, 513 (6th Cir. 2000)
(finding that prior decision on motion to dismiss "does not
establish the law of the case for purposes of summary judgment,
when the complaint has been supplemented by discovery").
Nonetheless, for the reasons stated above, I ultimately agree
with Clalit that the language employed by Berlin is not
precatory.

        [9]    Although the MOU is governed by New York law, because
the Berlin Will was executed in California, California law
applies to interpretation of the Berlin Will and, therefore, to
the question of whether the Berlin residuary estate was left to
IHF "on Clalit's behalf."  <u>See</u> Restatement (Second) Conflict of
Laws § 268 (explaining that in absence of choice-of-law clause,
"[a] will or other instrument creating a trust of interests in
movables is construed in accordance with . . . the rules of
construction of the state which the testator or settlor would
probably have desired to be applicable").

not result in a precatory trust in all cases. "Precatory words may or may not create a trust, according as they are used, and whether, in any particular will, they have been used for this purpose will depend upon the construction to be given to that will." In re Mitchell's Estate, 117 P. 774, 775 (Ca. 1911).

Thus, Berlin's use of the word "request" -- as opposed to a mandatory verb such as "direct" -- is not dispositive. Rather, the Berlin Will as a whole is subject to the "cardinal rule" of will interpretation, which is to "ascertain the intention of the testator." In re Mitchell's Estate, 117 P. at 775.[10] In In re Estate of Moore, a case relied upon by IHF, the court found that the testator created a merely precatory trust when she left her estate to her daughter and then "request[ed]" that "my said daughter VIRGINIA M. KWASKY shall distribute such portion or portions of my estate which I have heretofore left to either my daughter LOIS VERYL SERPA and my grand-daughter LINDA

---

[10]    The parties make much of an opinion letter that IHF received from a California attorney in 2000 with respect to IHF's obligations under the Berlin Will.  In the letter, the attorney expresses the opinion that "[t]he language of the gift . . . are [sic] clearly precatory," (Def.'s 56.1 Statement Ex. 27, at 2), with the implication being that IHF was free to distribute or not distribute the money at its discretion.  IHF argues that the opinion "correctly sets forth California law" and "establishes IHF's state of mind with respect to its obligations under the Berlin Will."  (Def.'s Mem. of Law at 18; Def.'s Reply Mem. of Law at 5).  The latter is immaterial because it is Berlin's state of mind -- not IHF's -- that is determinative of IHF's obligations with respect to the Berlin funds.  Moreover, the former is not evidence, but rather purports to set forth the law as the attorney understood it in 2000.  See, e.g., Densburger v. United Techs. Corp., 297 F.3d 66, 74 (2d Cir. 2002) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions.") (quotation omitted).

SERPA, <u>as in her opinion shall be reasonable and necessary</u>."  61
Cal. Rptr. at 723-24 (emphasis added).  The court found that this
language might have created a "moral obligation," but not a legal
one, because the language did not impose "mandatory duties."  <u>Id.</u>
at 724-25.  Indeed, the daughter in <u>Moore</u> was explicitly given
discretion to do what she believed was "reasonable and
necessary."

        Here, by contrast, the Berlin Will specifically
identifies Clalit facilities as the ultimate intended
beneficiaries, down to the precise percentage of the residual
estate that each Clalit facility was to receive.  Though
certainly not a model of draftsmanship, the language employed in
the Berlin Will sufficiently evinces an intent to devise a
specified portion of the residuary estate to Clalit facilities.
There is no qualifying language -- such as in <u>Moore</u> -- that
suggests that Berlin only intended IHF to distribute the money to
Clalit if, in IHF's judgment, the distribution was "reasonable
and necessary," nor has IHF pointed to any extrinsic evidence to
suggest that Berlin intended anything other than for the
specified portion to go to Clalit.  Given the plain and
unambiguous language of the MOU that requires IHF to turn over to
Clalit all requests received on its behalf, a reasonable jury
could only conclude that IHF was obligated under the MOU to
distribute the specified portion of the Berlin Will proceeds to
Clalit.  Accordingly, summary judgment is granted to Clalit on
its breach of contract claim against IHF regarding the Berlin

Will, and IHF's motion for summary judgment on this claim is
denied.[11]

### 3. The Nower Trust

Nower executed a living trust in 1992, directing that
upon his death "all property then belonging to the income or
principal of the Trust" be paid to IHF "for the express benefit
and general use in Israel of the Kupat Holim Hospitals in Israel
and for no other purpose and said charitable foundations should
not use the funds domestically."  (Nower Trust at 6) (emphasis
added).  As noted above, the MOU required IHF to transmit to
Clalit all funds that IHF received "on [Clalit's] behalf."  (MOU
at ¶ 5).  Thus, had the trust been funded, IHF would have been
required to transmit the trust corpus to Clalit.  As explained
above, however, the trust was never funded.  Clalit nevertheless
argues, without any citation to the record, that summary judgment
for IHF is inappropriate because Nower's assets "should have been
maintained in the name of the Nower trust," and that they were

---

[11]     The parties spend many pages arguing over the use of
the phrase "if possible."  I find that the phrase is mere
surplusage, as possibility is implied into any bequest.  It
would, after all, be unreasonable to expect any executor or
devisee to do the impossible.  In any event, there is nothing
here to suggest that the bequest was not possible.  To the
contrary, Stanley J. Abrams, the former executive director of
IHF, conceded as much at his deposition:

> Q:   If you look at, turning to the Will . . . it says
>      "if possible."  Was there anything that made it
>      impossible to give this money to any of these
>      entities here?
>
> A:   No.

(Abrams Dep. 240:4-8).

"mistakenly held by Nower in trust for IHF."  (Pl.'s Mem. of Law
at 21).  This assertion, standing alone as it does, does not
create an issue of material fact.  It is well-established that
such "conclusory statements, conjecture, or speculation are
inadequate to defeat a motion for summary judgment."  <u>Woodman v.</u>
<u>WWOR-TV, Inc.</u>, 411 F.3d 69, 85 (2d Cir. 2005) (citations
omitted).

        Clalit also argues that IHF is not entitled to summary
judgment despite the fact that the Nower Trust was never funded
because IHF -- through its employee Levitt, who served as a
trustee -- had a duty to ensure that the trust was funded.
Although there is no indication in the trust document that Levitt
was to serve as trustee as an agent for or representative of IHF,
Clalit points to evidence in the record that Levitt was a trustee
within her scope of employment because part of her job at IHF was
to cultivate relationships with potential donors.  For example,
at her deposition Levitt testified as follows:

            Q.   How did you build your
        relationships with your donors?

            A.   The way I would build a
        relationship with a friend.  I found out what
        was interesting about them and they found out
        what was interesting about me.  We liked each
        other.  Otherwise they didn't deal with me.
        Many people walked away . . . . Those that
        stayed with me, they stayed because they
        appreciated my honesty and my integrity[.]

(Levitt Dep. 12:19-13:4).  Similarly, Alvin Smolin, a former
executive vice president of IHF, testified that "a lot of people
became very good friends of ours because of the way we deal with

- 16 -

them." (Smolin Dep. 79:11-13).[12] Likewise, Stanley J. Abrams, another former executive vice president of IHF, testified about the importance of "personal relationship[s]" between the foundation and its potential donors. (Abrams Dep. 220:8). These facts might have served to raise an issue as to the capacity in which Levitt served as trustee had the trust actually been funded, but ultimately -- and fatally to Clalit's claim -- they do not raise an issue of material fact as to entitlement to the disputed portion of Nower's estate.

It is well established that the transfer of identifiable property is required for the creation of a trust. See Restatement (Third) of Trusts § 10 (explaining that trust may be created by "a transfer inter vivos by a property owner to another person as trustee for one or more persons," or by "a promise . . . that creates enforceable rights in a person who immediately or later holds those rights as a trustee, or who pursuant to those rights later receives property as a trustee"); see also In re Herskowitz's Estate, 338 So. 2d 210 (Fla. Dist. Ct. App. 1976) ("It is well established that to constitute a valid trust there must be . . . property to which the trust may and does pertain[.]"); Grapes v. Mitchell, 159 So. 2d 465, 469 (Fla. 1964) (explaining that for trust to be valid it must have "a definite subject matter"); In re Craft's Estate, 320 So. 2d

---

[12] Smolin's answer was in response to a question about whether he solicited IHF clients after he left IHF and began working at a different charitable foundation. One implication of the testimony, however, is that the friendships were formed while Smolin was at IHF.

874, 875 (Fla. Dist. Ct. App. 1975) (same); <u>Fraser v. Lewis</u>, 187

So. 2d 684, 687 (Fla. Dist. Ct. App. 1966) (same);[13] <u>see also</u>

Black's Law Dictionary 1509 (6th ed. 1990) (listing as essential

element of trust "actual delivery to trustee").  Here, it is

undisputed that the trust that Nower purported to create was

never funded.  Rather, Nower held the disputed funds in

certificates of deposit that were held in "ITF" accounts for IHF.

Under Florida law, this created a so-called "Totten trust," a

tentative trust revocable at will by the depositor until he dies,

at which time ownership vests in the donee, which in this case

was IHF.  <u>See, e.g.</u>, <u>Saporta v. Saporta</u>, 766 So. 2d 379, 380 &

n.1 (Fla. Dist. Ct. App. 2000).  It was for this reason that the

court-appointed guardian was ordered to distribute the accounts

to IHF.  (Def.'s 56.1 Statement Exs. 31 & 32).

        Nonetheless, Clalit argues that IHF received the money

from the accounts "on behalf of" Clalit because "IHF would never

have received any money at all from Nower but for Nower's

decision to leave his assets through IHF to Clalit and no one

else."  (Pl.'s Mem. of Law at 21).  But, apart from the unfunded

trust itself, Clalit is unable to point to any fact in the record

to indicate that Nower intended the ITF accounts to go to Clalit,

or that Nower did not intend for that money to go to IHF.

Moreover, far from being able to point to identifiable property

_____

        [13]    I apply Florida law to the determination of the
validity of the Nower Trust, as the trust document was executed
in Florida and Nower's guardian was appointed by a Florida court.
(Def.'s 56.1 Statement Exs. 30, 31, 32).

or a definite subject matter of the trust, Clalit is left to speculate that perhaps Nower intended to fund the trust with some unspecified portion of the funds from the ITF accounts. This speculation is insufficient to defeat summary judgment. If Nower had wanted to give the funds to IHF for Clalit's behalf, he could have easily funded the trust. Instead, he deposited the funds into the ITF accounts without any indication that he was doing so for the benefit of Clalit.

On this record, I hold that no reasonable jury could find that Clalit is entitled to any portion of the disputed Nower funds, which as a matter of law became the property of IHF upon Nower's death. Thus, IHF's motion for summary judgment on this claim is granted, and Clalit's motion is denied.[14]

### 4. Failure to Account and Provide Documents

Finally, the amended complaint also asserts a claim that IHF breached the MOU "by failing to account and provide documents and information called for under the MOU" (Am. Compl. ¶ 60), presumably with respect to bequests other than those of Berlin and Nower. Neither party has moved for summary judgment on this claim. Nevertheless, in light of the extensive discovery

---

[14]    It is unclear whether Clalit was moving for summary judgment on the Nower claim or simply opposing IHF's motion. Clalit's Notice of Cross-Motion stated that Clalit sought an order "granting Clalit's cross-motion for summary judgment awarding it . . . damages cause by the failure of [IHF] to transmit moneys due Clalit from the Berlin Estate and Nower trust." (Pl.'s Notice of Cross Motion at 1-2). Nevertheless, Clalit's briefs in support of its cross-motion do not seem to affirmatively argue that it is entitled to summary judgment on this claim. Regardless, to the extent Clalit did move for summary judgment, the motion is denied.

that has taken place in this case after the Court ordered IHF to produce all documents pertaining to bequests directed for any medical or health purpose in Israel (even if they did not specifically name Clalit), and Clalit having failed to identify any particular bequest with respect to which IHF has failed to provide the allegedly required information, the Court concludes that this claim is now moot.  It is therefore dismissed.

## C.    Declaratory Judgment Claims

The Declaratory Judgment Act "permits declaratory relief only in cases presenting 'actual controvers[ies],' . . . a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution."  Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996) (citations omitted).  "For a court to have subject matter jurisdiction over a declaratory judgment action, there must be 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  Id. (citation omitted).

There is "no bright line rule for determining 'whether the dispute presents a substantial controversy or merely an abstract question' . . . . Instead, courts must decide whether a justiciable controversy exists 'on a case-by-case basis.'"  Am. Pioneer Tours, Inc. v. Suntrek Tours, Ltd., No. 97 Civ. 6220 (DLC), 1998 WL 60944, at *2 (S.D.N.Y. Feb. 13, 1998) (quoting Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 562

(2d Cir. 1991)).  Finally, the Court has discretion as to whether to grant declaratory relief.  Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995); see also 10B Charles Alan Wright et al., Federal Practice and Procedure § 2759 (1998) ("[I]t is well settled by a multitude of cases that the granting of a declaratory judgment rests in the sound discretion of the trial court[.]").

Here, IHF seeks summary judgment on Clalit's claim for a declaratory judgment that the MOU obligates IHF to (1) transfer to Clalit "all monies that were donated or bequeathed to IHF that named Clalit or a Clalit program or facility as the intended recipient of the Bequest, for Clalit's benefit, whether bequeathed prior to or after September 9, 1996."  (Def.'s Mem. of Law at 26) (citing Am. Compl. ¶ 64(b)).  IHF argues that this claim does not present an actual controversy because it necessarily requires the Court to decide "in a vacuum" the intent of various testators whose wills are not before the Court. (Def.'s Mem. of Law at 27).  Clalit, for its part, asserts that a justiciable controversy exists because there are "existing but not yet consummated bequests that have been made through IHF on behalf of Clalit," and it seeks to have the Court "clarify and settle the legal relations between the parties."  (Pl.'s Mem. of Law at 22).

I find it unnecessary to decide whether this claim presents an actual controversy, because even assuming that it did I would decline to grant the sought-after relief.  As the Supreme Court has stated,

> By the Declaratory Judgment Act, Congress
> . . . created an opportunity, rather than a
> duty, to grant a new form of relief . . . .
> Consistent with the nonobligatory nature of
> the remedy, a district court is authorized,
> in the sound exercise of its discretion, to
> stay or to dismiss an action seeking a
> declaratory judgment before trial . . . . In
> the declaratory judgment context, the normal
> principle that federal courts should
> adjudicate claims within their jurisdiction
> yields to considerations of practicality and
> wise judicial administration.

Wilton, 515 U.S. at 288.  A declaratory judgment that IHF is

required to pass on to Clalit funds intended for Clalit would be

no different than a declaration that the MOU is a valid and

enforceable contract, an issue that is not in question.  The real

issue that Clalit seeks to resolve is whether unspecified and

unidentified bequests are received by IHF "on its behalf," a

question that is impossible to resolve in a vacuum.  This claim

is therefore dismissed.

### CONCLUSION

For the reasons set forth above, the cross-motions for

summary judgment are granted in part and denied in part.  Summary

judgment is granted to Clalit on its claim that IHF breached the

MOU with respect to the Berlin Will, and IHF's motion for summary

judgment on that claim is denied.  Summary judgment is granted to

IHF dismissing the Nower and failure-to-account claims, and

Clalit's motion for summary judgment on the Nower claim is

denied.

Remaining are two claims for a declaratory judgment

that the MOU obligates IHF to (1) account to Clalit regarding all

estates in probate and all bequests intended for Clalit; and (2)
provide information pursuant to paragraphs 7-10 of the MOU. (Am.
Compl. ¶ 64).

Counsel for the parties shall appear for a pretrial
conference on September 21, 2005, at 10:30 a.m. in Courtroom 11A
of the United States Courthouse at 500 Pearl Street, New York,
New York.

SO ORDERED.

Dated:   New York, New York
         August 31, 2005

                                    DENNY CHIN
                                    United States District Judge